**LAW OFFICES OF DAVID A. TORRES**
David A. Torres, SBN 135059
1318 "K" Street
Bakersfield, California 93301
Tel.: (661) 326-0857
Fax: (661) 326-0936

Attorney for Jose Trinidad Salas

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 14-cr-00046-LJO-SKO |
| Plaintiff, | MOTION TO QUASH WARRANT AND SUPPRESS EVIDENCE |
| vs. | Date: October 27, 2014<br>Time: 8:30 a.m.<br>Honorable Lawrence J. O'Neil |
| JOSE TRINIDAD SALAS, | |
| Defendant. | |

**TO: BENJAMIN B. WAGNER, UNITED STATES ATTORNEY, LAUREL MONTOYA, ASISTANT UNITED STATES ATTORNEY, COUNSEL FOR PLAINTIFF:**

PLEASE TAKE NOTICE that on October 27, 2014 at 8:30 a.m., or as soon thereafter as counsel may be heard before the HONORABLE LAWRENCE J. O'NEIL, United States District Court Judge, the defendant, Trinidad Salas, will bring on for hearing the following motion to quash the warrant which was based on the search of 12554 Davis Road, McFarland, California and the evidence found and statements which were taken at the time the search was conducted.

Dated: September 24, 2014        LAW OFFICE OF DAVID A. TORRES

                                 BY: /s/David A. Torres
                                     DAVID A. TORRES

                                 Attorney for Jose Trinidad Salas

-1-

## STATEMENT OF THE FACTS

On February 18, 2014, Affiant, Special Agent Micah Sutrov, submitted an application for a search warrant at 12254 Davis Road, McFarland, California. The Honorable Jennifer L. Thurston authorized the search warrant on that same date. The affidavit in support of the search warrant details Affiant's experience and training. Affiant points out his years of experience with drug investigations and his knowledge as to the common habits and customs of "narcotic traffickers." Specifically, he points out that narcotic traffickers typically place assets in names of others and that traffickers commonly have fruits of their drug trafficking activities stored in their home.

In support of Affiant's request, Affiant details numerous intercepted calls made or received by Jose Trinidad Salas. However, the affidavit begins with Affiant mentioning his contacts with a confidential informant who claims that he knows Mr. Salas to be a "large scale cocaine, methamphetamine, heroin and marijuana distributor and bulk cash smuggler." Affiant further claimed that the Confidential Informant met up with Mr. Salas in January 2013 at EM Trucking. While at EM Trucking, Mr. Salas informed the Confidential Informant that the diesel tanks were made with hidden compartments. Mr. Salas received a truck and two suitcases from the owner of EM Trucking as a gift. The Confidential Informant claimed that he was then ordered by Mr. Salas to follow him as he drove back to 12254 Davis Road. He further was ordered by Mr. Salas to cause the police to pull him over if the police began to follow Mr. Salas. None of this information was corroborated by any outside source.

In August of 2013, Affiant requested authorization for a wiretap of Mr. Salas' phone which was granted by the Honorable Lawrence J. O'Neill. Affiant's request to wiretap Mr.

Salas' phone continued until January 17, 2014. Through this five to six month span, Affiant monitored numerous phone calls made or received by Mr. Salas.

- **August 27, 2013:** Mr. Salas called Jose Luis Vazquez Millan aka Chepe. They speak of the "main guy out there" having an appointment to get a Visa. The conversation continues about "some guys" wanting to meet someone trustworthy. Chepe later states, "Everything is good. With, with a good number of rims and well everything." The call is continued and Chepe agrees to bring $2000 to Mr. Salas during Mr. Salas' lunch.

- **September 11, 2013:** Chepe calls Mr. Salas in regards to a telephone number. Mr. Salas indicates "I never talk to him…and I never see him." Chepe states that there are things for him to look at. Mr. Salas suggests that he call Guara. The conversation continues regarding everyone there being at a standstill because no one can contact the person who changed his/her number.

- **September 17, 2013:** Mr. Salas was informed that cops were getting ready to "bust a mission" somewhere. He informed Mr. Salas that there were at the library on Kern and they were going to raid a house. Mr. Salas speaks to another unknown male in regards to a possible firearm located at his residence. He requested the unknown male to retrieve the possible firearm because cops were getting together in McFarland. During the conversation the unknown male states, "…you don't have anything else around there?" Mr. Salas, "no…no…no…just that."

- **September 28, 2013**: Salas speaks to unknown male referred to as OSO. OSO indicates that he was hired in the hood on one-eleven.

- **October 3, 2013**: Darnell Taylor called Mr. Salas in regards to a broken gate. Mr. Taylor was inquiring whether Mr. Salas had a motor for the gate and Mr. Salas informed him that he did but the motor was too big so he should just get the motor fixed or replace it with small motor.

- **October 3, 2013**: Mr. Salas speaks to a man named Eusubio. Eusubio discusses the broken gate motor and he does not want to buy a new one. He informs Mr. Salas that he believes

-3-

he can turn the power down on the big motor so it can work on the broken gate. The conversation continues about the broken gate and how it opened but it won't close. Eusubio then informs Mr. Salas that Chepe wanted to buy a grey little Honda that Mr. Salas gave to Eusubio. Eusubio then indicates that Eva's father was giving Chepe "yada-yada" there. Eusubio states, "It seems like they harvest there, uh grapes, right?" Mr. Salas states, "I think…oh, yes, yes…yes, that's true." Eusubio indicated he would take ten of the grapes. As the conversation goes on, Mr. Salas states, "How is the water there?" Eusubio states, "oh, man…well more less, dude…we've stalled because of…the ride, but everything is good dude as soon as it gets fixed then they'll leave, yada-yada."

- **October 3, 2013**: Chepe calls Mr. Salas to inform him he changed the truck papers and will take the papers to Mr. Salas.

- **October 16, 2013:** Eusubio calls Mr. Salas about a "guy" getting arrested near Tio's Tacos. He states to Mr. Salas that he was on his way to do something and he got caught with that shit. Mr. Salas shows concern for Chepe and the possibility of him being "bugged." Mr. Salas and Eusubio continue discussing what the "guy" needs to say in regards to the car. Later Eusubio informs Mr. Salas that the "guy's" bail is $30,000. The discussion continues as to why the bail is so low. Eusubio informs Mr. Salas that "D" is not here anymore. Mr. Salas at first did not know who he was talking about but Eusubio informed Mr. Salas that "D" had to take care of something so he took off. He indicated that he told "D," "I'll send you a little bit, over there, over where Corey was."

- **October 16, 2013**: Darnell Deshawn Taylor calls Mr. Salas to tell him that he is out in Mississippi with Corey. An unidentified male gets on the phone and informs Salas, "well…we're

trying to retire like you man." Mr. Salas tells them to not do it because they just started. The phone is returned to Mr. Taylor and Mr. Salas inquires as to when he is returning.

- **October 16, 2013**: Mr. Salas called Chepe. Chepe asks Mr. Salas if he heard about Guara. Mr. Salas states, "Yes." Chepe states, "Yeah, that's how things are."

- **October 19, 2013**: Eusubio calls Mr. Salas and they speak of the "guy" who was arrested. Eusubio states, he told him to not go over with Gordito if they just throw out his case. Eusubio continues to state that he thinks if they let him go it's just because they are trying to watch him and see where he goes. Salas agreed. Eusubio and Mr. Salas continue there conversation about using the "Benzillo" if the plates are changed. However, Mr. Salas, "No, even if you changed the plates on that fucker dude, they know that one really well." Eusubio then asks Mr. Salas if the Avalanche he has over there is fixed. Mr. Salas states that everything would need to be changed on the Avalanche. Mr. Salas later tells Eusubio his concern with combining all that mess from there to here and if that happens they will not get out with what they have. Eusubio then later agrees that he is going to have purchase a car at the dealership.

- **October 21, 2013**: Eusubio calls Mr. Salas and they discuss "D." Mr. Salas asks if "D" did good over where he went. Eusubio states, "No." Eusubio informs Mr. Salas "how was he going to do good if they caught that guy." Mr. Salas states, "He's there and no yada-yada." Mr. Salas then inquires about the "guy" who was arrested. Eusubio indicates he does not have any information but he was going to give him some money.

- **December 20, 2013:** Mr. Salas received a call from a woman named Marta. Marta informed Mr. Salas that the streets were blocked where Luis lives. Mr. Salas indicated that he did not know what it was about and that he did not know any numbers to see what was occurring.

Mr. Salas then states, "Who knows…I can honestly tell you uh, I can tell that I don't…well I never, never speak with them."

- **December 20, 2013**: Mr. Salas speaks to Robert and asks him to call his girl to see if "big boy" is alright.

- **December 20, 2013**: Robert calls Mr. Salas and tells him that "Big Boy" will try to call him. Mr. Salas indicates that he is at work but that he will call him.

- **December 20, 2013**: Robert calls Mr. Salas again and tells him that everything is all right. He informed Mr. Salas that the roads were blocked because there was a high speed chase.

- **December 24, 2013:** Mr. Salas received an incoming text message from an unidentified male: "Butibai k asiendo. Hope u have a good xmas eve foo I love u thank u for everything butibai may God bless u witt life full of happiness, ur brother LU."

Affiant lends his interpretation of the conversations he monitored based on his training and experience. He explains that he believes Mr. Salas' discussion confirm that he is the owner of numerous cars and properties that are not in his name because he is the person called to make decisions regarding the cars and properties. He alleges that Mr. Salas talks in code during some of his conversations. For example, when "grapes" is mentioned Affiant indicates that this term is often used for marijuana. Affiant claims when "water" is mentioned that is in reference to the business. He even claims when the term "out there" is stated, Mr. Salas is speaking of Mexico.

Affiant further provides information about two arrests made during the pendency of his investigation. The first arrest mentioned by Affiant was of Rodolfo Rodriguez aka Guala/Guara. Mr. Rodriguez was arrested on October 15, 2013 after a traffic stop. The car that Mr. Rodriguez was driving was registered to Jose Millan Vazquez (Chepe). The arrest occurred near 3900 West 111th Place, which is believed to be owned by Mr. Salas. During the traffic stop, a sealed United

States Postal box was seen in the front seat. During a later search of the package, suspected methamphetamine was located. The second arrest occurred on or about November 15, 2013. Darnell Deshawn Taylor was arrested at the Amtrak station in Albuquerque, New Mexico. When officers searched his checked in suitcase, 3.1 kilograms of methamphetamine was located. Mr. Taylor was on his way to Jackson, Mississippi.

Based upon the abovementioned information, Affiant applied for a search warrant at 12254 Davis Road, McFarland Avenue to search for indicia of narcotics trafficking.

## LEGAL ARGUMENT

### I.
### REASONABLE EXPECTATION OF PRIVACY

The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. The Fourth Amendment protects people not places. Katz v. United States, 389 U.S. 347, 351 (1967). Therefore, it is incumbent open the defendant to demonstrate a legitimate expectation of privacy in the place searched or the thing seized. Rakas v. Illinios, 439 U.S. 128, 143 (1978). The capacity to claim the protection of the Fourth Amendment depends not upon the property right in the invaded place but upon whether the person who claims the protection of the Fourth Amendment has a legitimate expectation of privacy in the invaded place. Id. at 143. A person's expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable. Katz, 389 U.S. at 361. Although not dispositive, one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude. Rakas, 439 U.S. at 143 n. 12.

Here, there is no question that Mr. Salas was more than a guest at the home searched. In fact, it was attested to in the affidavit that it was clear that Mr. Salas had control over the

residence. Therefore, Mr. Salas has a reasonable expectation of privacy at 12254 Davis Road, McFarland, California and can challenge the warrant that was executed at the residence.

## II.
## THE WARRANT TO SEARCH THE PREMISES AT 12254 DAVIS ROAD WAS NOT SUPPORTED BY PROBABLE CAUSE

In Illinois v. Gates (1983) U.S. 213, the Court emphasized, "The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of crime will be found in a particular place." Id. at p. 238.

In establishing whether the affidavit has established a sufficient showing of probable cause, a reviewing court should assess the opinions, conclusions and the reliability of the information articulated in the affidavit. Thus, an affidavit, which relates conclusions without revealing foundation facts to support the conclusions therein, is insufficient to establish probable cause. "A mere conclusory statement…gives the magistrate virtually no basis at all for making a judgment regarding probable cause…His action cannot be a mere ratification of the bare conclusion of others." Id. at p. 239.

In United States v. Garcia-Villalba, 585 F.3d 1223 (9th Cir., 2009), the Drug Enforcement Agency (DEA) began an investigation which Agent Hackett went undercover. Hackett managed to get introduced to a front-line dealer. Hackett purchased significant quantities of methamphetamine on five separate occasions. Later, he bought heroin and cocaine. Id. at p. 1225. Agent Hacket obtained the front line dealers phone number, which became the focus of the investigation. After a year of actual investigation, the DEA sought a wiretap application. During a two month period, over 2,700 calls were intercepted. As the investigation continued,

the DEA unveiled new leads and requested additional wiretaps of other individuals. Id. at p. 1226. Based on the information received from the four wiretaps, a search warrant was sought to search four separate locations believed to be stash houses. One of the four structures named was located on Dunbar Road. This residence was referred to as the key stash house for narcotics and money. The warrant was authorized by a magistrate judge. During the execution of the warrant at the Dunbar residence, Agents located heroin, cocaine and methamphetamine. Digital scales, grams scales, sandwich bags, magazines for firearms, ammunition, drug ledgers, wire transfer receipts, bills and receipts were also located. Id. at p. 1226.

Following a motion to suppress for lack of probable cause within the affidavit, the district court granted the motion; however, applied the good faith exception and did not suppress the evidence. The government opposed the district court's finding contending that the "affidavit in support of the search warrant adequately connected narcotics trafficking to the Dunbar Road [residence]." Id. at p. 1233. The Ninth Circuit agreed with the government.

The Ninth Circuit pointed out that the affidavit begins by listing the affiant's "professional experience and his personal experience with the investigation. It also asserts that '[p]ersons involved in drug trafficking conceal in their residences and businesses caches of drugs.' Then, the affidavit spends ten pages discussing the information obtained through electronic surveillance." More specifically, the Ninth Circuit focused on Paragraph fifteen of the affidavit, which reads as follows:

> The DEA also has determined that [Cecilio, Armando], and Octaviano Armenta–Aceves use [the] Dunbar Road, Mount Vernon, Washington [residence], as a 'stash house' or storage location for narcotics and or money for the organization. This location, known as the "choza" or shack, has been referred to by the organization's members on numerous intercepted telephone calls, often after [Cecilio] receives an order for controlled substances. **Surveillance units have followed vehicles of organization members traveling from their residences to**

**the 'choza' immediately after [Cecilio] gave an order to deliver a controlled substance to a customer.** Id. at p. 1233, **emphasis added.**

Although the Ninth Circuit believed that many statements in the affidavit were conclusory, the Court went on to point out that the affidavit contained portions that filled in the missing details. For instance, the affidavit asserts that intercepted telephone calls expressly referred to the "choza" as the location where they met and where they went to bring and to pick up drugs and that surveillance units followed organization members to 17900 Dunbar Road immediately after the wiretap picked up impending news of a transaction. Even more, "within the affidavit, the government represented that DEA agents *actually saw* members of the organization frequent 17900 Dunbar Road immediately after hearing news on the wiretap of an impending drug transaction." When read together with the rest of the affidavit, these assertions establish a "fair probability" that drugs were stored at the Dunbar residence. Id. at p. 1234.

In the current case, Affiant provided nothing but conclusory statements unlike the affiant in Garcia-Villalba. Within those conclusory statements, Affiant did not fill in the blanks with actual observations corroborating the allegations set forth. Instead, Affiant gives his own unfounded interpretation of the conversations held by Mr. Salas. For instance, Affiant intercepted a call on August 27, 2013. During this call Mr. Salas is talking to Mr. Millan (chepe). The following is the conversation provided in the affidavit:

**Chepe**: "main guy out there is coming over."
**Salas** "By when?"
**Chepe** "He'll let you know."
**Salas**: "Is he trying to get a Visa."
**Chepe:** "Yeah. On that. Already coming. Might go out there to get him."
**Salas**: "Is he trying to get it already or what?"
**Chepe:** "He already has an appointment."

**Salas:** "We still need to see what happens. What did he put as his dependents so they will give it to him."

**Chepe:** "No, well he going over there dude because with those guys dude he wanted to meet someone trustworthy."

**Salas:** "But…it's uh, he cleared all that up, that guy, the young guy?"

**Chepe:** "No, well they already…left him a little car."

**Salas:** "And he's already done with that and he left the other thing there as well. But now he's with that."

**Salas**: "Oh, is it almost all…did he clear that up?

**Chepe**: "Already.  Everything is good. With, with a good number of rims and well everything."

Although this conversation does not seem out of the ordinary, Affiant claims otherwise. Affiant claims that Mr. Salas and Mr. Millan were speaking in coded language in order to elude law enforcement.  When they use terms like "main guy," "out there," "over there," "the other thing there," and "rims."  Affiant then goes on to claim that based on his training and experience, he knows that "out there" and "over there" are in reference to Mexico.  Based on this code, he came to the conclusion that this conversation was in regards to a key member of the Salas and Vazquez Millan criminal drug trafficking organization making plans to get to the United States from Mexico.  Affiant then claims that he believes the remainder of the conversation is about a pending drug shipment.  The key element that is missing from these conclusory statements is corroboration.   Affiant is adamant that Mr. Salas is a narcotics' trafficker and that all conversations documented relate to his drug trafficking organization, but he fails to provide any surveillance of drug transactions where Mr. Salas is involved. He fails to provide any information from confidential informants where Mr. Salas actually dealt in a drug transaction. Therefore, Affiant may be accurate about his allegations regarding verbiage used by drug traffickers, but until he can establish how Mr. Salas fits in that group, his speculatory assertions due not amount to probable cause.

In Garcia-Villalba, agents actually made drug transactions with the drug trafficking organization; they heard actual conversations about drug transactions and observed members of the drug trafficking organization head to the Dunbar residence immediately after intercepting calls regarding impending drug transactions. These observations along with the intercepted calls supported a complete picture where a magistrate could find that probable cause existed to issue the warrant. That complete picture that was depicted in the Garcia-Villalba was not offered to the magistrate in this current case. The magistrate was given speculatory and conclusory statements and then asked to fill in those holes with more speculatory and conclusory statements. When speculatory and conclusory statements are combined it does not equal probable cause instead it equals speculation and conclusions, which is insufficient for a finding of probable cause.

## III.
## THE WARRANT CANNOT BE DECLARED VALID PURSUANT TO THE DOCTRINE OF "GOOD FAITH"

The decision in United States v. Leon (1984) 468 US 897, should not shield the warrant from a judicial determination of invalidity.

It is anticipated the prosecution will assert the Affiant acted in good faith. However, in some circumstances an affiant does not have reasonable grounds for believing the warrant was properly issued.

> "Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his...reckless disregard of the truth.[citation omitted]. The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his...judicial role in the manner condemned in Lo-Ji Sales, Inc., v. New York (1979) 442 US 319, in such circumstances, no reasonably well-trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an

affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.[citations omitted]. Finally, depending on circumstances of the particular case, a warrant may be so facially deficient...that the executing officers cannot reasonably presume it to be valid." United States v. Leon (1984) 468 US 897.

Leon, demonstrates suppression is the appropriate remedy in four situations: (1) the issuing magistrate was misled by information the affiant knew or should have known was false; (2) the magistrate, "wholly abandoned his judicial role"; (3) the affidavit was, "so lacking in indicia of probable cause" that it would be unreasonable for the affiant to believe probable cause existed and (4) the warrant was so facially deficient that the executing officer could not reasonably presume it to be valid.

Here, Affiant cannot redeem this "bare bones" affidavit through the good faith exception. Suppression is the only appropriate remedy, seeing that Affiant should not have relied on the issuance of the warrant.

## CONCLUSION

In this case, the issuing Magistrate did not have the required information to establish probable cause.  Here, unfortunately, the magistrate relied on foundationless expert opinion and conclusory allegations, which does not support a finding of probable cause. As such, the warrant must be quashed and all evidence suppressed.

Dated: September 24, 2014

/s/David A. Torres
David A. Torres

Attorney for Jose Trinidad Salas